1

2

3

4

5

```
_____ FILED        _____ ENTERED
_____ LODGED       _____ RECEIVED

        NOV 2 0 2007 · LK

              AT SEATTLE
       CLERK U.S. DISTRICT COURT
   WESTERN DISTRICT OF WASHINGTON
                        DEPUTY
```

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

GREGORY BUSHANSKY, Individually and
on Behalf of All Others Similarly Situated,

10

Plaintiff,

11

v.

12

13

14

15

16

17

18

WASHINGTON MUTUAL, INC., ANNE V.
FARRELL, STEPHEN E. FRANK, KERRY K.
KILLINGER, THOMAS C. LEPPERT,
CHARLES M. LILLIS, PHILLIP D.
MATTHEWS, REGINA T. MONTOYA,
MICHAEL K. MURPHY, MARGARET
OSMER MCQUADE, MARY E. PUGH,
WILLIAM G. REED, JR., ORIN C. SMITH,
JAMES H. STEVER, DARYL D. DAVID, and
JOHN AND JANE DOES 1-20,

19

Defendants.

CASE NO. C 07-1874 RAJ

**CLASS ACTION**

**COMPLAINT FOR BREACHES OF
FIDUCIARY DUTY UNDER THE
EMPLOYEE RETIREMENT INCOME
SECURITY ACT**

|||||||| ||||| ||||| ||||| ||||| ||||| ||||| ||||| ||||
||||||||| ||| |||||| ||||| ||||| || ||||

**07-CV-01874-CMP**

20

### I. INTRODUCTION

21

1.     Plaintiff Gregory Bushansky ("Plaintiff") alleges the following based upon

22

personal information as to himself and the investigation of Plaintiff's counsel, which included a

23

review of U.S. Securities and Exchange Commission ("SEC") filings by Washington Mutual,

24

Inc. ("WaMu" or the "Company"), including the Company's proxy statements (Form DEF 14A),

25

26

annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K),

registration statement (Form S-8), and the annual reports (Form 11-K) filed on behalf of the

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 1

**ORIGINAL**

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    WaMu Savings Plan (the "Plan"), a review of the Forms 5500 filed by the Plan with the

2    Department of Labor with the U.S. Department of Labor, interviews with participants of the

3    Plan, and a review of available documents governing the operations of the Plan. Plaintiff

4    believes that substantial additional evidentiary support will exist for the allegations set forth

5    herein after a reasonable opportunity for discovery.

6

7                          **II. NATURE OF THE ACTION**

8        2.       This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and

9    (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) &

10   (a)(3), against the fiduciaries of the Plan for violations of ERISA.

11       3.       The Plan is a defined contribution retirement plan sponsored by WaMu.

12       4.       Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the

13   Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise

14   the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets

15

16   during the period July 19, 2006 through the present (the "Class Period").

17       5.       Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's

18   assets in WaMu common stock throughout the Class Period despite the fact that they knew or

19   should have known that such investment was unduly risky and imprudent due to the Company's

20

21   serious mismanagement and improper business practices, including, among other practices: (a)

22   the Company's over reliance on subprime lending; (b) the Company's participation in the

23   systematic manipulation of the loan origination process; (c) the Company's failure to implement

24   and maintain risk management control processes; and (d) the Company's failure properly to

25   account for its subprime lending business operations, all of which caused WaMu's financial

26   statements to be misleading and which artificially inflated the value of shares of WaMu stock

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 2

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   and the WaMu Stock Fund in the Plan ("Fund").  In short, during the Class Period, the Company

2   was seriously mismanaged and faced deteriorating financial circumstances that rendered WaMu

3   stock an unduly risky and inappropriate investment option for participants' retirement savings.

4
        6.      Plaintiff alleges in Count I that the Defendants who were responsible for the
5
    investment of the Plan's assets breached their fiduciary duties to the Plan's participants in
6
7   violation of ERISA by failing to prudently and loyally manage the Plan's investment in WaMu

8   stock.  In Count II, Plaintiff alleges that the Defendants, who were responsible for the selection,

9   monitoring and removal of the Plan's other fiduciaries, failed to properly monitor the

10  performance of their fiduciary appointees and remove and replace those whose performance was

11  inadequate.  In Count III, Plaintiff alleges that the Defendants breached their duty to inform the
12
    Plan's participants by failing to provide complete and accurate information regarding the
13
14  soundness of WaMu stock and the prudence of investing and holding retirement contributions in

15  WaMu equity.   In Count IV, Plaintiff alleges that Defendants breached their duties and

16  responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties

17  of prudent and loyal management, complete and accurate communications, and adequate

18  monitoring. Finally, in Count V, Plaintiff states a claim against WaMu for knowing participation
19
    in the fiduciary breaches alleged herein.
20
        7.      As more fully explained below, during the Class Period, Defendants imprudently
21
22  permitted the Plan to hold and acquire millions dollars in WaMu stock despite the fundamental

23  problems the Company faced.  Based on publicly available information for the Plan, it appears

24  that Defendants' breaches have caused the Plan to lose well over *175 million dollars* of

25  retirement savings during the Class Period.

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 3

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

8.      This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

9.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as the Plaintiff to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in WaMu common stock during the Class Period.

10.     In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

## III. JURISDICTION AND VENUE

11.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     **Personal Jurisdiction.** ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 4

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R.

2   Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general

3   jurisdiction in the State of Washington.

4       13.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C.

5   § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary

6   breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or

7

8   transact business in this district.

9                                    **IV.  PARTIES**

10  **A.      Plaintiff.**

11      14.     Plaintiff Gregory Bushansky is a resident of Massapequa, New York.  Plaintiff

12  Bushansky is a participant in Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and

13  was a participant in the Plan throughout the Class Period.  He continues to hold shares of

14  Company stock in his retirement account in the Plan and did so throughout the Class Period.

15

16  **B.      Defendants.**

17      15.     The Defendants are identified below.  All of the Defendants are fiduciaries of the

18  Plan within the meaning of ERISA, as is explained below in Section VI ("Defendants' Fiduciary

19  Status"), and all of them breached their fiduciary duties in various ways as is explained in

20  Section XI ("Causes of Action").

21

22      16.     **Defendant Washington Mutual, Inc.** is a consumer and small business banking

23  company with operations in major U.S. markets.  WaMu is incorporated in the State of

24  Washington, with its principal executive offices located at 1301 Second Avenue, Seattle,

25  Washington.  WaMu's common stock is listed on the New York Stock Exchange and trades

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 5

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   under the ticker symbol "WM." As described more fully below, the Company was a fiduciary

2   for the Plan.

3       17.     **Director Defendants.** The WaMu Board of Directors (hereinafter the "Board") is

4   the governing body of WaMu under its charter, its bylaws, and applicable Washington law, and,

5   unless otherwise-noted, comprises the persons who carried out the Company's responsibilities

6   with respect to the Plan. The members of the Board during the Class Period included:

7

8           a.     **Defendant Anne V. Farrell** has served as a Director of WaMu since

9           1994.

10          b.     **Defendant Stephen E. Frank** has served as a Director of WaMu since

11          1997.

12          c.     **Defendant Kerry K. Killinger** has served as a Director of WaMu since

13          1988 and is the Chairman and Chief Executive Officer of WaMu. Defendant

14          Killinger served as the President of the Company from 1988 until 2005. He

15          became the Chief Executive Officer in 1990 and the Chairman of the Board of

16          Directors in 1991.

17          d.     **Defendant Thomas C. Leppert** has served as a Director of WaMu since

18          2005.

19          e.     **Defendant Charles M. Lillis** has served as a Director of WaMu since

20          2005.

21          f.     **Defendant Phillip D. Matthews** has served as a Director of WaMu since

22          1998.

23          g.     **Defendant Regina T. Montoya** has served as a Director of WaMu since

24          2006.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 6

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1         h.      **Defendant Michael K. Murphy** has served as a Director of WaMu since

2         1985.

3         i.      **Defendant Margaret Osmer McQuade** has served as a Director of

4         WaMu since 2002.

5

6         j.      **Defendant Mary E. Pugh** has served as a Director of WaMu since 1999.

7         k.      **Defendant William G. Reed, Jr.** has served as a Director of WaMu since

8         1970.

9         l.      **Defendant Orin C. Smith** has served as a Director of WaMu since 2005.

10        m.      **Defendant James H. Stever** has served as a Director of WaMu since

11        1991.

12

13  18.      As is explained in more detail below, the Board had certain responsibilities with

14  respect to the Plan, including appointment and oversight responsibilities, and the Board and its

15  members were therefore fiduciaries of the Plan.  The Board and its members listed above are

16  referred to as the "Director Defendants."

17  19.      **Human Resources Committee Defendants.** As explained in more detail below,

18  the Human Resources Committee of the Board of Directors ("HR Committee") had certain

19  responsibilities with respect to the Plan, including appointment and oversight responsibilities,

20  and the HR Committee and its members were therefore fiduciaries of the Plan.  The Defendants

21  identified in this paragraph are referred to as the "HR Committee Defendants."  On information

22  and belief, the HR Committee Defendants are as follows:

23

24        a.      **Defendant Stever** has served as a member of the HR Committee during

25        the Class Period and is the Committee's Chairman.

26        b.      **Defendant Frank** has served as a member of the HR Committee during

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 7

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    the Class Period.

2        c.    **Defendant Lillis** has served as a member of the HR Committee during the

3    Class Period.

4        d.    **Defendant Matthews** has served as a member of the HR Committee

5    during the Class Period.

6

7        e.    **Defendant Osmer McQuade** has served as a member of the HR

8    Committee during the Class Period.

9    20.   **Plan Investment Committee Defendants**. As explained in more detail below,

10   the Investment Committee Defendants have the responsibility for selecting the investment funds

11   in the Plan and were assigned the responsibility for monitoring the performance of those funds

12   by the Company, the Board and/or the HR Committee. The identities of the Investment

13   Committee Defendants are currently unknown to Plaintiffs and are therefore named fictitiously

14   as John and Jane Does 1-10. Once the identities of the Investment Committee Defendants are

15

16   ascertained, Plaintiff will seek leave to join them under their true names. The Investment

17   Committee Defendants (John and Jane Does 1-10) are referred to as the "Investment Committee

18   Defendants."

19

20   21.   **Plan Administration Committee Defendants**. As explained more fully below,

21   on information and belief, the Plan assigns certain fiduciary responsibilities and duties to the

22   Plan Administration Committee. The Administration Committee members have full authority

23   and power to administer and construe the Plan. On information and belief, the individual

24   Administration Committee Defendants are as follows:

25       (a).   **Defendant Daryl D. David** has served as a member of the Administration

26   Committee during the Class Period.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 8

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

22.     The identities of the remaining members of the Administration Committee are currently unknown to the Plaintiff and are therefore named fictitiously as John and Jane Does 11-20.   Once the identities of additional Administration Committee members are ascertained, Plaintiff will seek leave to join them under their true names.  The Administration Committee and its members (Defendant David and John and Jane Does 11-20) are referred to as the "Administration Committee Defendants."

## V. THE WAMU SAVINGS PLAN

23.     The Plan, sponsored by WaMu, is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plan is a legal entity that can sue and be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

24.     The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in a trust fund administered by Fidelity Management Trust Company, the Plan's Trustee. *See* WaMu Savings Plan Summary Plan Description (Jan. 2007) (hereinafter the "SPD") at 32.

25.     The Plan became effective on July 1, 1973.  The purpose of the Plan is to encourage employees to accumulate capital for their retirement. *See* WaMu Savings Plan as Amended and Restated Effective January 31, 2006 (hereinafter the "Plan Document").

26.     Employees are eligible to participate in the Plan at commencement of their employment. *Id.* § 2.2.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 9

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

27.     Individual accounts are maintained for each Plan participant. Participants' accounts are credited with Employer and Participant-directed contributions and earnings, expenses, gains and losses. *Id.* § 9.1

28.     Throughout the Class Period, participants in the Plan were permitted to defer a percentage of their base compensation for investment in the Plan. Plan participants are allowed to contribute between 1% and 75% of their compensation, up to the annual maximum permissible under the Internal Revenue Code. *Id.* § 4.1.

29.     Effective January 1, 2004, the Company matches: (a) 100% of a participant's contributions that does not exceed 3% of the participant's considered compensation for the Plan Year; plus (b) 50% of a participant's contribution in excess of the first 3% of the participants considered compensation, up to 5% of a participant's considered compensation for the Plan Year, for a maximum total matching contribution of 4% of a participants considered compensation for the Plan Year. *Id.* § 5.1.

30.     Effective January 1, 2004, a Profit Sharing Contribution may be made in an amount, if any, determined by the Employer, in its sole and absolute discretion. *Id.* § 5.2.

31.     The Plan fiduciaries, by and through the Investment Committee, select the investment options made available to participants of the Plan. *Id.* § 10.1. The Plan fiduciaries, by and through the Investment Committee, are provided with authority to change Plan investment options from time to time in their discretion. *Id.* §§ 10.1, 12.2(c). The Plan does not limit the fiduciaries' ability to change investment options.

32.     The Company Stock Fund is one of the investment options selected by the Plan fiduciaries. Nothing in the Plan requires this option, or as noted above, limits the ability of the Plan fiduciaries to remove the option, or divest assets invested in the option as prudence dictates.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 10

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    33.    Plan participants direct the investment of their contributions and the Company

2    matching and profit sharing contributions among the various investment options in the Plan. *Id.*

3    § 10.3.

4
     34.    The Plan designated the portion of the Plan invested in WaMu common stock as a
5
6    purported Employee Stock Ownership Program ("ESOP"). *See* SPD at 20.

7    35.    An employee stock ownership plan is an ERISA plan that is designed to invest

8    primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). As with a 401(k) plan

9    without an ESOP component, fiduciaries of an ESOP remain bound by core ERISA fiduciaries

10   duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing

11   benefits to plan participants.

12
     36.    The Plan has incurred substantial losses as a result of the Plan's investment in
13
14   WaMu common stock. As of December 31, 2006, the Plan held approximately 8 million shares

15   of WaMu common stock, then having a market value of approximately $341.4 million. *See*

16   WaMu Savings Plan, Annual Report (Form 11-K") at 14 (Dec. 31, 2006) (hereinafter the "2006

17   Form 11-K"). Following revelations that WaMu failed to establish adequate reserves for its loan

18   losses due to subprime lending and participated in the manipulation of loan originations, among

19   other improper practices, WaMu common stock has collapsed. The price of WaMu stock has
20
     dropped approximately 60 percent since the beginning of the Class Period.
21

22                          **VI. DEFENDANTS' FIDUCIARY STATUS**

23   **A.    The Nature of Fiduciary Status.**

24   37.    **Named Fiduciaries.**    Every ERISA plan must have one or more "named

25   fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).    The person named as the

26   "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 11

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    such a designation, the sponsor is the administrator.   ERISA § 3(16)(A), 29 U.S.C.

2    § 1002(16)(A).

3       38.   **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly

4    named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who

5

6    in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises

7    any discretionary authority or discretionary control respecting management of such plan or

8    exercises any authority or control respecting management or disposition of its assets, (ii) he

9    renders investment advice for a fee or other compensation, direct or indirect, with respect to any

10   moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he

11   has any discretionary authority or discretionary responsibility in the administration of such plan."

12   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

13

14      39.   Each of the Defendants was a fiduciary with respect to the Plan and owed

15   fiduciary duties to the Plan and the participants and beneficiaries under ERISA in the manner

16   and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

17      40.   As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

18   § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest

19
     of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under
20
     the circumstances then prevailing that a prudent man acting in a like capacity and familiar with
21
22   such matters would use in the conduct of an enterprise of a like character and with like aims.

23      41.   Plaintiff does not allege that each Defendant was a fiduciary with respect to all

24   aspects of the Plan's management and administration.  Rather, as set forth below, Defendants

25   were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 12

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    exercised by each of them, and, as further set forth below, the claims against each Defendant are

2    based on such specific discretion and authority.

3        42.    Instead of delegating all fiduciary responsibility for the Plan to external service

4    providers, WaMu chose to assign the appointment and removal of fiduciaries to itself and the

5    other monitoring Defendants named herein.  These persons and entities in turn selected WaMu

6    employees, officers and agents to perform most fiduciary functions.

7

8        43.    ERISA permits fiduciary functions to be delegated to insiders without an

9    automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C.

10   § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of

11   participants and beneficiaries, not in the interest of the Plan sponsor.

12

**B.    WaMu's Fiduciary Status.**

13

14       44.    The Plan Document states that WaMu or the Board of Directors are authorized to

15   appoint, and hence to monitor and remove, the members of the Investment Committee. Plan

16   Document § 2.39.  As Department of Labor regulations make clear, these are fiduciary functions

17   under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

18       45.    WaMu also had the responsibility to appoint, and hence to monitor and remove,

19   the Trustee, and, upon information and belief, to execute the Trust documents with the Trustee to

20   provide for the investment, management and control of the assets of the Plan.  Plan Document §

21   11.2.

22

23       46.    Moreover, WaMu, at all applicable times, on information and belief, has

24   exercised control over the activities of its employees that performed fiduciary functions with

25   respect to the Plan, including the Investment Committee Defendants and Administration

26   Committee Defendants, and, on information and belief, can hire or appoint, terminate, and

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 13

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    replace such employees at will. WaMu is, thus, responsible for the activities of its employees

2    through traditional principles of agency and *respondeat superior* liability.

3          47.    Finally, under basic tenants of corporate law, WaMu is imputed with the

4    knowledge that the Defendants had regarding the misconduct alleged herein, and, hence, like the

5    fiduciaries who acted on WaMu's behalf, had knowledge of the imprudent actions alleged

6    herein.

7

8          48.    Consequently, in light of the foregoing duties, responsibilities, and actions,

9    WaMu was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21),

10   during the Class Period in that it exercised discretionary authority or discretionary control

11   respecting management of the Plan, exercised authority or control respecting management or

12   disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility

13   in the administration of the Plan.

14

15   **C.     The Director Defendants Fiduciary Status.**

16         49.    WaMu, as a corporate entity, cannot act on its own without any human

17   counterpart. In this regard, during the Class Period, on information and belief, WaMu relied and

18   continues to rely directly on the Board of Directors to carry out its fiduciary responsibilities

19   under the Plan and ERISA.

20

21         50.    Specifically, the Director Defendants were responsible for appointing, and hence

22   monitoring, and removing, the members of the Investment Committee. *Id.* at 2.39.   Thus,

23   according to Department of Labor regulations, the Director Defendants, exercised a fiduciary

24   function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

25         51. Consequently, in light of the foregoing duties, responsibilities, and actions, the

26   Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 14

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or

2  discretionary control respecting management of the Plan, exercised authority or control

3  respecting management or disposition of the Plan's assets, and/or had discretionary authority or

4  discretionary responsibility in the administration of the Plan.

5

6  **D.    HR Committee Defendants' Fiduciary Status.**

7  52.    The Director Defendants established the HR Committee to act as a fiduciary to

8  "[o]versee the management of any Plan trust funds and periodically review the performance of

9  the funds and the investment managers of the funds for the purpose of assessing their

10 effectiveness." *See* HR Committee Charter at 1. The HR Committee reported to the Board of

11 Directors, which retained decision-making authority on behalf of the Company. HR Committee

12 Charter.

13

14 53.    The scope of the HR Committee's responsibilities are not entirely clear from the

15 Plan Document. Whereas the Plan charges "WaMu or the Board" with responsibility for

16 appointing the Investment Committee, the Plan subsequently states that The HR Committee is

17 responsible for appointing "a Plan Administration Committee and a Plan Investment

18 Committee." *Compare* Plan Document § 2.38 and § 12.1. To the extent that the HR Committee

19 exercised responsibility for appointing, monitoring, and removing other Plan fiduciaries,

20 according to Department of Labor regulations, the HR Committee Defendants exercised a

21 fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

22

23 54.    Consequently, in light of the foregoing duties, responsibilities, and actions, the

24 HR Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA §

25 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary

26 authority or discretionary control respecting management of the Plan, exercised authority or

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 15

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  control respecting management or disposition of the Plan's assets, and/or had discretionary

2  authority or discretionary responsibility in the administration of the Plan.

3  **E.      Investment Committee Defendants' Fiduciary Status.**

4
5  55.     The Plan provides that the Investment Committee is a "Named Fiduciary" for

6  purposes of § 402(a) of ERISA.  The Investment Committee Defendants had the responsibility of

7  selecting the investments in the Plan and monitoring the performance of the investment funds,

8  including the Company Stock Fund in the Plan.  Plan Document §§ 10.2(a), 12.2(c).

9  56.     The Investment Committee also is authorized to "change the investment funds

10  from time to time in its discretion." *Id.* § 10.2(a).

11  57.     In addition, the Investment Committee has the following powers and duties:

12
13          i.   To direct the Trustee in the investment, reinvestment, and disposition of
                 the Trust, including the investment of up to 100% of the Trust in

14               qualifying employer securities. (as defined in section 407(d)(5) of ERISA)
                 without regard to the limitations of ERISA sections 407(a)(2), (3), or (4),

15               as provided in the Trust Agreement;

16          ii.  To review, select or remove, and monitor investment funds and fund
                 managers;

17
18          iii. To receive and review reports of the financial condition and of the receipts
                 and disbursements of the Trust from the Trustee;

19
20          iv.  To furnish the Employer with information which the Employer may
                 require for tax or other purposes;

21
22          v.   To engage the services of or remove an Investment Manager or Managers
                 (as defined in ERISA section 3(38)), each of whom shall have full power

23               and authority to manage, acquire or dispose (or direct the Trustee with
                 respect to acquisition or disposition) of any Plan asset under its control;
                 and

24
25          vi.  To interpret and construe the Plan with respect to the investment,
                 reinvestment, and disposition of Plan assets.

26
Plan Document § 12.2(c).

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 16

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

2

58.     The Plan's Form 11-K states that the HR Committee "delegated its duties with

3    respect to Plan investments to the Plan Investment Committee." 2006 11-K at 8.

4           59.     Consequently, in light of the foregoing duties, responsibilities, and actions, the

5    Investment Committee Defendants were named fiduciaries of the Plan pursuant to ERISA §

6    402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21),

7    29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control

8
     respecting management of the Plan, exercised authority or control respecting management or
9

10   disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility

11   in the administration of the Plan.

12   **F.      Administration Committee Defendants' Fiduciary Status.**

13          60.     The Plan provides that the Administration Committee is a "Named Fiduciary" for

14   purposes of § 402(a) of ERISA. The Plan also provides that the Administration Committee is the

15   "Plan Administrator," and that it shall have the following powers and duties:

16
17            i. Make and enforce such rules and regulations as it shall deem necessary or
                 proper for the efficient administration of the Plan;

18
             ii. Interpret the provisions of the Plan and resolve any question arising under
19               the Plan, or in connection with the administration or operation thereof;

20           iii. Make all determinations affecting the eligibility of any Employee to be or
                  become a Participant;
21

22           iv. Determine eligibility for and amount of retirement benefits for any
                 Participant;
23

24            v. Authorize and direct the Trustee with respect to all disbursements of
                 benefits under the Plan;
25

26           vi. Employ and engage such persons, counsel and agents and to obtain such
                 administrative, clerical, medical, legal, audit and actuarial services as it
                 may deem necessary in carrying out the provisions of the Plan;

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 17

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE (206) 623-1900
FACSIMILE: (206) 623-3384

1

2          vii.  Delegate and allocate specific responsibilities, obligations and duties
                 imposed by the Plan to one or more employees, officers or such other
3                persons as the Plan Administrator deems appropriate; and

4          viii. Amend the Plan for changes in the laws or regulations related to the Plan,
                 to clarify any provisions in the Plan or correct any errors in the document,
5                to simply administration or for administrative convenience, and for any
                 other reason provided that with respect to an amendment .for any other
6                reason., the delegate reasonably believes that the amendment will not have
                 the impact of significantly increasing the cost or potential liability
7                exposure of the Plan to the Employer. The authority set forth in this
                 section 12.2(b)(viii) may be delegated only to a senior executive of the
8                Company.

9

10   Plan Document § 12.2(b).

11       61.     Moreover, upon information and belief, in order to comply with ERISA, during at

12   least part of the Class Period the Administration Committee exercised responsibility for

13   communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner,

14   by means of the Plan's SPDs. *See* ERISA § 101(a)(1) (requiring the plan administrator to

15   furnish to each participant covered under the plan and to each beneficiary who is receiving

16   benefits under the plan a summary plan description).

17

18       62.     The SPDs and, on information and belief, other information disseminated by the

19   Administration Committee to the participants of the Plan incorporated by reference the SEC

20   filings described below, which contained misleading information regarding the financial

21   condition of WaMu and its results of operations.

22
         63.     Consequently, in light of the foregoing duties, responsibilities, and actions, the
23
     Administration Committee Defendants were both named fiduciaries of the Plan pursuant to
24
     ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of
25
     ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or
26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 18

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    discretionary control respecting management of the Plan, exercised authority or control

2    respecting management or disposition of the Plan's assets, and/or had discretionary authority or

3    discretionary responsibility in the administration of the Plan.

4                    **VII. FACTS BEARING ON FIDUCIARY BREACH**

5

6    **A.   WaMu Was an Imprudent Investment for the Plan during the Class Period Because**
     **of its Serious Mismanagement, Precipitous Decline in the Price of its Stock and its**
7    **Rapidly Deteriorating Financial Condition.**

8         **1.    Summary.**

9         64.    During the Class Period, WaMu stock became an imprudent investment for

10   participants' retirement savings because of, *inter alia*, the Company's highly risky and

11   inappropriate origination practices and related financial mismanagement, which artificially

12   inflated the value of WaMu stock and exposed the Plan to huge losses.

13

14        65.    WaMu's inappropriate origination practices and related mismanagement concern,

15   among other problems, the Company's: (1) increasingly risk-fraught lending practices; (2) lack

16   of adequate risk-management controls over its improper lending practices contributing to high

17   delinquency and foreclosure rates among borrowers; (3) role in the systematic inflation of

18   property appraisals during the loan origination process; and (4) misrepresentations regarding the

19   Company's financial condition, which caused the price of WaMu stock to be artificially inflated

20   during the Class Period.

21

22        66.    Throughout the Class Period, the Company suffered from grave mismanagement

23   and corresponding deterioration of its financial condition. As the consequences of this conduct

24   have come to light, WaMu's share price has lost 60 percent of its value. Accordingly, under

25   these circumstances, investment in WaMu stock was imprudent, as reflected in the enormous

26   losses suffered by the Plan.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 19

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE· (206) 623-1900
FACSIMILE: (206) 623-3384

1    **2.      The Rise of the Subprime Lending Industry.**

2    67.     WaMu, like the mortgage banking industry as a whole, experienced rapid growth

3    in mortgage loan revenue in recent years. Between 2003 and 2005, WaMu's production of

4    subprime loans increased from $14.1 billion to $34.5 billion. Annual Report (Form 10-K) (Dec.

5    31, 2005) (hereinafter the "2005 Form 10-K").

6

7    68.     Industry experts have attributed the proliferation of subprime loans to a

8    confluence of factors in 2004 and 2005, including rising home prices, declining affordability,

9    historically low interest rates, intense lender competition, innovations in the structure and

10   marketing of mortgages, and an abundance of capital from lenders and mortgage securities

11   investors. *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony*

12   *Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate: Federal Deposit*

13   *Insurance Corporation on Mortgage Market Turmoil: Causes and Consequences*, Mar. 22, 2007,

14   *available at* http://www.fdic.gov/news/news/speeches/chairman/ spmar22071.html.

15

16   69.     Upon information and belief, in 2004, as interest rates began to climb, the pool of

17   potential prime borrowers looking to refinance began to dry up and lenders began extending

18   loans to subprime borrowers with troubled credit histories in an effort to maintain or grow

19   market share in a declining origination environment.

20

21   70.     To take advantage of this new market, lenders weakened their underwriting

22   standards, including:

23            (a).    reducing the minimum credit score borrowers need to qualify for certain

24            loans;

25            (b).    allowing borrowers to finance a greater percentage of a home's value or to

26            carry a higher debt load;

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 20

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1        (c).    introducing new products designed to lower borrowers' monthly payments

2        for an initial period; and

3        (d).    allowing borrowers to take out loans with little, if any, documentation of

4        income and assets.

5

6  *See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks*

7  *Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

8      71.    In addition to lowering underwriting standards, lenders introduce new loan

9  products, which enticed borrowers but also put them at greater risk of default:

10      **(a).**    **No-documentation and low-documentation loans**: Known in the

11      industry as "liar loans," the practice of requiring little or no documentation from

12

13      borrowers constituted as much as 40 percent of subprime mortgages issued in

14      2006, up from 25 percent in 2001.  *See* Gretchen Morgenson, *Crisis Looms In*

15      *Mortgages*, N.Y. Times, Mar. 11, 2007.

16      **(b).**    **Piggy-back loans**: These combine a mortgage with a home-equity loan or

17      line of credit, allowing borrowers to finance more than 80 percent of the home's

18      value without paying for private mortgage insurance.  As of 2006, about half of

19      all subprime loans included "piggyback" loans, and on average all borrowers

20

21      financed 82 percent of the underlying value of their property, markedly up from

22      48 percent in 2000.  *See Id.*; James R. Hagerty & Ruth Simon, *Home Lenders*

23      *Pare Risky Loans – More Defaults Prompt Cut in 'Piggyback' Mortgages;*

24      *Housing Market May Suffer*, Wall St. J., Feb. 14, 2007, at A3.

25      **(c).**    **Interest-only mortgages**: These allow borrowers to pay interest and no

26      principal in the loan's early years, which keep payments low for a time, but

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 21

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1          require that the deferred payment of principal be made in the future through

2          increased monthly or balloon payments.

3          **(d).**    **Option adjustable-mortgages**: The most prevalent of which are hybrid

4          adjustable rate mortgages ("ARMs"), the loans are marketed with promotional or

5          "teaser" rates during the loan's introductory period that later balloon to much

6          higher rates once the introductory period has ended.  ARMs currently account for

7          between one-half and one-third of subprime mortgages.  *See* Testimony of Roger

8          T. Cole, Director, Division of Banking Supervision and Regulation, The Federal

9          Reserve Board, *Mortgage Markets*, Before the Committee on Banking, Housing

10         and    Urban    Affairs,    U.S.    Senate,    Mar.    22,    2007,    *available    at*

11         http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm.

12

13    **3.**    **The Fall of the Subprime Lending Industry.**

14

15    72.    As early as 2004, industry watchdogs began expressing growing fears that relaxed

16    lending practices were increasing risks for borrowers and lenders in overheated housing markets.

17    *See* Simon, *Mortgage Lenders, supra.*  As lenders made it easier for borrowers to qualify for a

18    loan by such practices as described above, they were also greatly increasing the likelihood that

19    borrowers would be unable to make payments, and that defaults would rise.  Of particular

20    concern was the prevalence of adjustable-rate loans, which, in combination with the lowered

21    lending standards, were more likely to result in borrowers' early payment defaults.

22

23    73.    In May 2005, bank regulators issued their first-ever guideline for credit-risk

24    management for home-equity lending and, in December 2005, new guidelines for mortgage

25    lenders were issued as well.  *Id.*; Testimony of Sandra L. Thompson, *supra.*  The proposed

26    "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a clear message to the

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 22

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   marketplace that bank regulators were concerned about the lessened underwriting standards and

2   general lax risk management practices of subprime lenders.

3        74.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes and

4   the interest rates on variable rate loans, including mortgage loans, began to rise.  Subprime

5   borrowers who were able to afford the initially low "teaser rate" loan payments no longer could

6   meet their monthly payment obligations.  At the same time, home values began to decline

7

8   sharply, leading some borrowers to walk away from loans when they could not afford the

9   increased monthly mortgage and could not readily re-sell the property for a profit.  As a result,

10  many borrowers no longer paid their mortgages, causing defaults to increase significantly.

11       75.    As of mid-2005, delinquency rates for subprime loans (60-days or more past due)

12  rose for the first time since 2002.  By the fourth quarter of 2005, delinquencies and foreclosures

13
    began to rise even more severely -- as of October 2005 the delinquency rate was twice that
14
15  recorded on new subprime loans a year earlier. *See* Simon & Hagerty, *More Borrowers, supra.*

16       76.    According to the FDIC, total subprime delinquencies rose from 10.33 percent in

17  the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006 and foreclosures rose

18
    from 1.47 percent to 2.0 percent over the same period.  Testimony of Sandra L. Thompson,
19
    *supra.*
20

21       77.    AMR subprime loans accounted for the largest rise in delinquency rates, an

22  increase from 9.83 percent to 14.44 percent between the fourth quarter of 2004 and the fourth

23  quarter of 2006; whereas foreclosures rose from 1.5 percent to 2.7 percent during the same

24  period. *Id.*

25       78.    In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many

26  shortly after origination. *See* Simon & Hagerty, *More Borrowers, supra.*

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 23

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    79.    The imminent collapse of the subprime lending industry was widely-documented.

2    In December 2006, the Center for Responsible Lending issued a report predicting the worst

3    foreclosure crisis in the modern mortgage market. Ron Nixon, *Study Predicts Foreclosure For 1*

4    *In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006. Shortly after, several major mortgage lenders

5    disclosed extraordinary rates of loan defaults, triggering inquiries from SEC and FDIC, and

6    resulting in several bankruptcy filings.

7

8        4.    **WaMu Engaged in Risky and Inappropriate Subprime Lending Practices and Serious Mismanagement.**

9

10    80.    Despite the many warnings issued by industry analysts and government

11    regulators, as well as other negative indicators, such as rising interest rates and a cooling housing

12    market, for much of the Class Period, WaMu continued to engage in risky and inappropriate

13    lending practices and to make inaccurate prognostications about its financial future.

14        a.    **WaMu Shifts Its Focus to the High-Risk Subprime Market.**

15    81.    During the real estate industry's rapid growth from 2002 - 2005, WaMu grew its

16    mortgage business substantially, recording record levels of revenue in 2005. However, WaMu,

17    which sold its direct subprime lending business to Citigroup in 2003, was late to expand into the

18

19    subprime lending business.

20    82.    WaMu's subsidiary, Long Beach Mortgage, experienced strong growth in the

21    subprime lending market, which prompted WaMu executives to target the broader subprime

22    market for expansion.

23    83.    In its 2005 Annual Report, WaMu announced that:

24

25        The Company remains committed to the subprime mortgage market and
        intends to increase the loan volume of its subprime mortgage business,
        Long Beach Mortgage Company, and to maintain the size of its purchased
26        subprime home loan portfolio. A portion of the Company's Card Services
        portfolio is made up of subprime credit card loans and Card Services may

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 24

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    continue to originate a portion of its credit card loans to subprime
2    borrowers. If unemployment were to rise or either a slowdown in housing
     price appreciation or outright declines in housing prices were to occur,
3    subprime borrowers, who tend to have greater vulnerability to such
     changes than prime borrowers, may be unable to repay their loans and the
4    credit performance of the Company's subprime portfolios could suffer,
     with a potential adverse effect on earnings.
5
6    2005 Form 10-K at 4.

7        84.    Even then, industry observers questioned both the efficacy and timing of WaMu's

8    decision to make subprime lending a prominent part of its business operations. As *The Seattle*

9    *Times* reported in November 2005:

10       For anyone who thinks of Washington Mutual as a buttoned-down bank
11       dishing up only plain-vanilla loans, meet Long Beach Mortgage.

12       The WaMu subsidiary is one of the country's largest lenders to people
         with damaged credit.
13
14       That's not the kind of business most folks associate with WaMu, a
         conservative institution with roots in the meat-and-potatoes thrift industry.
15       By dipping into subprime lending – a term that refers to borrowers who
         can't get best, or prime, rate – WaMu has moved into an arena that was
16       once dominated by specialty lenders, such as Household Finance and The
         Money Store.
17
         ***
18
19       Long Beach made more than a quarter of all WaMu home-purchase loans
         last year, and [CEO] Killinger wants the business to grow faster than
20       WaMu's traditional mortgage lending.

21       For one thing, it's more profitable.

22       "We earn better margins in the subprime business because we're very
         efficient and have an advantage over some competitors," he said.
23
24       That does not appease analysts who worry about what will happen when
         interest rates go up and borrowers have a harder time making payments.

25       "I hate the business," said Richard Bove, an analyst with Punk, Ziegel &
26       Co. "Asking people who can't afford to buy something to pay up to buy
         that product is a concept that, for me, doesn't work."

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 25

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

2

3
> Long Beach is one of the top 10 subprime mortgage lenders in the country and growing fast. It made loans of $8.4 billion in the third quarter, more than twice its volume a year earlier. And it has added about 900 of its 2,500 employees in the past year.

4

5
> WaMu sells many of Long Beach's loans to investors, and it buys subprime mortgages from other lenders as investments. About 10 percent of the loans in its portfolio at the end of the quarter were subprime.

6

7
> Robert Napoli, an analyst at Piper Jaffray, asked executives on a recent conference call why they want to expand the subprime area.

8

9
> "It seems that margins in the industry are, for the most part, at record lows, so it seems that maybe this isn't the best time to be aggressively growing the business," Napoli said.

10

11
Melissa Allison and Justin Mayo, *WaMu Has Stake In Risky, Sub-Prime Arena*, The Seattle Times, Nov. 13, 2005.

12

13

14

15

16

17
85.     WaMu decided to expand its subprime business despite the cooling housing market and despite the fact that the subprime lending is a notoriously dodgy segment of the mortgage industry.  In fact, prior to its acquisition by WaMu, Long Beach Mortgage had been sued by the United States Department of Justice for violations of the Fair Housing Act and related discriminatory practices.  *See* Settlement Agreement, Sept. 5, 1996, *available at* http://www.usdoj.gov/crt/housing/documents/longbeachsettle.htm.

18

19

20

21

22

23

24

25

26
86.     Turnover of key personnel exacerbated the risk posed by WaMu's increased exposure to subprime.  In November 2005, WaMu announced the retirement of its Chief Enterprise Officer, James Vanasek. *See* Current Report (Form 8-K) (Nov. 2, 2005) at Ex. 99.1. Then, in late December 2005, WaMu announced a dramatic re-alignment of its subprime lending oversight, and that Craig Chapman, then-president of the group responsible for overseeing subprime, would leave WaMu in January 2006.  WaMu touted the operating efficiencies that this shift would produce and assured investors that "we have a strong and experienced leadership team that recognizes the unique characteristics of the subprime business." *See* Current Report

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - Page - 26

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    (Form 8-K) (Dec. 21, 2005) at Ex. 99.1.

2    87.    Despite these factors, WaMu consistently represented throughout the Class Period

3    that it had implemented and maintained adequate internal controls and sufficient risk

4    management strategies. *See* Quarterly Report (Form 10-Q) (June 30, 2006) at 59; Quarterly

5    Report (Form 10-Q) (Sept. 30, 2006) at 58; 2006 Form 10-K at 3.

6

7    88.    During this period, WaMu dramatically increased both its origination of subprime

8    mortgages and its securitization and resale of those mortgages to other banks and investors. The

9    short-term revenue and profit gains appeared promising. In 2005, revenue from sales and

10   servicing of home mortgage loans grew to $1.79 billion, compared with $1.47 billion in 2004.

11   WaMu attributed the improved performance to increased sales of the Company's Option ARM

12   product. *See* Current Report (Form 8-K) (Jan. 18, 2006) at Ex. 99.1.

13

14   *89.*   The Company's 2005 results also showed that mortgage-lending boom had run

15   out of steam. Revenue from sales and servicing of home mortgage loans, mortgage sales and

16   servicing revenue fell from $497 million in the third quarter to only $264 million in the fourth

17   quarter. *Id.* Despite the declining revenue and deteriorating market conditions, including a

18   cooling market and interest rate increases, WaMu chose to expand its subprime operations, as

19   alleged *supra.*

20

21            **5.    WaMu Continued to Offer Subprime Loans Despite the High Risk of**
              **Default or Foreclosure.**

22

23   90.    Even after the risks of subprime lending were indisputably known, WaMu

24   continued to extend subprime loans to borrowers which contained many of the weakened lending

25   terms discussed in Section VII(A)(2), *supra.* WaMu's aggressive marketing of these loans

26   resulted in massive increases in loan delinquencies and foreclosures and put the financial health

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 27

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    of the Company in jeopardy.

2        91.    For every quarter since Q2 2006, WaMu has ranked as one of the largest

3    subprime lenders in the country. *See* Nat'l Mortgage News Online, *available at*

4    http://data.nationalmortgagenews.com.

5

6        92.    Not until early 2007 did WaMu begin to acknowledge the dire consequences of its

7    risky business practices, as management publicly recognized the impact of the deteriorating

8    housing market on its business and increased its forecast for losses due to loans.

9        93.    The *Wall Street Journal* reported on what would become a quarterly habit, the

10   Company's substantially increasing its forecast for loan losses:

11           WaMu's mortgage unit was hit hard by the slowing housing market. The
12           thrift's subprime mortgage business, which lends to customers with
             blemished credit, was hurt as more borrowers struggled to make their
13           payments and more loans became delinquent.

14           "Subprime encountered significant difficulties," Chief Executive Kerry
15           Killinger said, citing a mix of a slowing housing market, overcapacity in
             the sub-prime mortgage-origination industry and credit deterioration.
16
             The Seattle bank now forecasts that its overall provision for loan and
17           credit-card losses this year would reach between $1.1 billion and $1.2
             billion, up from the $850 million to $950 million it had projected in
18           October. In addition to worsening subprime credit quality, WaMu also
             attributed the increase to an accounting change for credit-card loans held
19           for sale, among other factors. But management stressed that its credit-card
20           portfolio has performed very well.

21   Ann Carrns, *Earnings Digest: WaMu Net Rises On Sale of Unit; Revenue Declines*, Wall
     St. J., Jan.18, 2007.
22
         94.    On January 18, 2007, WaMu's stock price closed at $44.26 per share.
23
         95.    The results of WaMu's aggressive and risky lending practices came in sharper
24
25   focus two months later, when the Company issued its Annual Report, which detailed the marked

26   increase in delinquencies and loan foreclosures for the subprime loans the Company was

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 28

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE· (206) 623-1900
FACSIMILE· (206) 623-3384

1    servicing. 2006 Form 10-K (Dec. 31, 2006).

2         96.    In April, WaMu announced a 20% decline in first quarter profit and once again

3    revised its estimated losses due to bad loans – this time nearly tripling its estimate for loan

4    losses. The *Wall Street Journal* reported:

5

6             Washington Mutual Inc., taking a beating from the cratering subprime-
              mortgage sector amid a housing downturn, said first-quarter profit fell
7             20%.

8             The Seattle thrift, the largest U.S. savings and loan by stock-market value,
              nearly tripled its provision for loan losses, to $234 million from $82
9             million, as its home-loans business swung to a loss of $113 million from a
              profit of $52 million a year ago.
10

11            Chief Executive Kerry Killinger said the thrift has curtailed its subprime-
              mortgage lending by 51% from the prior-year quarter to reduce its
12            exposure. The thrift also stopped buying mortgages from smaller
              "correspondent" lenders be-cause it has less control over loan
13            underwriting in that business.

14            WaMu ranked 11th last year in originating subprime mortgages, as home
              loans to borrowers with weak credit are called, according to Inside
15            Mortgage Finance, a Bethesda, Md., industry newsletter.

16            Also, among the top-five U.S. home-mortgage lenders, WaMu last year
17            made the highest percentage of loans to investors or second-home buyers,
              according to a Wall Street Journal analysis of data filed with banking
18            regulators. Such loans are generally considered riskier than those to
              owner-occupants.
19

20            "Our home-loans business was challenged during the first quarter by
              difficult market conditions," Mr. Killinger said in a statement. He said the
21            steps taken so far should position the thrift to grow as the market
              improves.
22
      Ann Carrns, *Earnings Digest: Washington Mutual Earnings Slide on Home-Loan Losses,*
23    Wall St. J., Apr. 18, 2007.

24         97.    Defendant Killinger attempted to assure investors:

25            "Over the past 12 months, we have taken a number of prudent actions to
26            reduce our exposure to the subprime mortgage industry," Mr. Killinger
              said in a statement. "These actions, along with a diversified business mix,

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 29

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

limited our exposure to the mortgage market's downturn and position us
well to expand and grow as market conditions improve."

*Bad Loans Inhibit Profits At Three Regional Banks*, Associated Press, Apr. 18, 2007.

98.     Killinger also opined that the mortgage crisis presented WaMu with an opportunity:

With a number of competitors going out of business, we're now able to
have better pricing, and the credit quality of the loans being originated
thus far in '07 is significantly better than in '06....It's too early to declare
victory, but we are seeing encouraging signs.

Amy Martinez, *Subprime Fallout Hits WaMu*, The Seattle Times, Apr. 18, 2007.

99.     Defendant Killinger reiterated his positive outlook in July 2007, when he announced his expectation that the Company's home loans group would return to profitability. *WaMu Beats Forecasts With 8.2% Profit Gain*, The Seattle Times, July 18, 2007. In fact, the full extent of WaMu's exposure to the mortgage market's downturn had yet to be disclosed.

100.    Just one month after Killinger's assurance, the Company acknowledged that liquidity had diminished significantly in the market for subprime-backed securities. WaMu's share price lost 2.2 percent of its value, falling to $35.95 per. *WaMu's Shares Decline on Mortgage Woes*, The Seattle Times, Aug. 11, 2007.

101.    Despite the constant stream of negative results relating to its subprime operations, WaMu continued to write the riskiest subprime loans as late as July 2007. Defendant Killinger acknowledged so during an interview with reporters at *San Francisco Chronicle*:

But at significantly lower volumes.  We tried to reduce our participation.
The conclusion we have made is that the slowdown in housing prices and
the risk of the housing market have increased this year, making the 2/28
and 3/27 products less appropriate than they'd been in the past.  Those
products worked well when housing prices were continuing to increase.

*Interview with Kerry Killinger*, San Francisco Chronicle, Aug. 12, 2007.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 30

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1      102.   Killinger also admitted that lending standards had deteriorated during the

2   subprime boom:

3

4
> Q: Why would anyone make a stated-income loan in the first place?  Why would a practice like that become the norm?

5

6

7
> Q:  From competitive pressures, from significant excess of capital flooding into the business from Wall Street.  That's really what it was. Severe competitive pressure leading to a loosening of underwriting standards for the industry.

8   *Id.*

9      103.   On September 10, 2007, Defendant Killinger spoke at the Lehman Brothers 2007

10   Financial Services Conference and assured the market that WaMu had positioned itself "to be a

11   successful in what is rapidly *becoming* a challenging business environment." *See* Current Report

12   (Form 8-K) (Sept. 13, 2007) at Ex. 99.1.

13

14      104.   Defendant Killinger lauded, among other things, the quality of loans held in the

15   Company's investment portfolio.  On a powerpoint slide, he assured investors that 82% of

16   WaMu's home loans, including those made through the subprime mortgage channel, had loan-to-

17   value ratios of less than 80%.  *Id* at Slide 12.

18      105.   Two days later, WaMu announced that it was shuttering its erstwhile subprime

19   juggernaut, Long Beach Mortgage.  Matthew Padilla, *Washington Mutual Shutting Down*

20   *Anaheim Subprime Unit*, The Orange County Register, Sept.14, 2007.

21

22      106.   WaMu's belated efforts to rein in its subprime business could not mitigate the

23   impact of its subprime binge.  On October 5, 2007, WaMu announced a 75% drop in third-

24   quarter profit.

25

26
> The other shoe dropped Friday for Washington Mutual, as the giant Seattle-based thrift said the collapsed housing and mortgage markets will lead to a 75 percent drop in third-quarter profit.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 31

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

\*\*\*

2

3

4

As the nation's housing bubble has deflated, WaMu's stockpile of delinquent loans, foreclosed properties and other non-performing assets has risen – both in absolute terms, to more than $4 billion, and as a share of its total assets, to 1.3 percent, as of June 30.

5

Drew DeSilver, *WaMu Forecasts Big Drop in Profit*, The Seattle Times, Oct. 6, 2007.

6

7

### a. WaMu Concealed the Fact That Its Subprime Origination Practices Artificially Inflated the Value of Its Loans.

8

107.   On November 1, 2007, WaMu's woes were exacerbated, when New York State

9

Attorney General Andrew Cuomo filed suit against First American Corp. ("First American"),

10

alleging that it had conspired with WaMu to artificially inflate property appraisals in connection

11

with WaMu's origination of loans (hereinafter the "Attorney General Suit"). *Available at*

12

http://www.oag.state.ny.us/press/2007/nov/EA%20Complaint.pdf.

13

14

108.   The Attorney General Suit alleges that, beginning in July 2006, WaMu pressured

15

First American and its affiliates to use certain "preferred appraisers" and that First American

16

responded by allowing "WaMu's loan production staff to hand-pick appraisers who bring in

17

appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to

18

pressure [] appraisers to change values that are too low to permit loans to close...." *Id.* at ¶ 8.

19

20

21

22

23

109.   The inflation of the property appraisals not only permitted WaMu to write loans in circumstances where none should have been written, but also, by falsifying the key Loan-to-Value ration, permitted WaMu's inflation of the value of those loans whether kept as investments or securitized and sold to third parties. As WaMu explains in its Annual Report:

24

25

26

Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because,

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1          in general, both default risk and the severity of loss is higher when
           borrowers have less equity to protect in the event of foreclosure.
2
   2006 Form 10-K.
3
4          110.    Put differently, not only did WaMu dramatically alter its risk exposure though

5   increasing its subprime lending exposure, it also purposefully exposed itself to higher risk loans

6   and more severe loss – without disclosing so – by participating in the manipulation of the

7   origination process.

8          111.    In addition the potential liability for violating state and federal laws, these
9
   fraudulent practices pose grave danger to WaMu's financial condition. With regard to affected
10
   loans that were sold to third-parties, WaMu is susceptible to the forced re-purchase of the loan
11
12  due to its breach of warranties regarding the loan's origination process or subsequent

13  performance.

14         112.    As set forth in the Company's Annual Report:

15         In the ordinary course of business, the Company sells loans to third parties
           and in certain circumstances … retains credit risk exposure on those loans.
16         The Company may also be required to repurchase sold loans when
           representations and warranties made by the Company in connection with
17         those sales are breached.

18
   *Id.*
19
20         113.    WaMu fares little better with regard to those loans it has kept as its own

21  investments. Discovery of the revised Loan-to-Value ration requires that WaMu recalculate the

22  value of the asset in its own portfolio. The heightened risk profile of the loans also means that

23  WaMu has insufficient reserves for loan losses.

24         114.    On the heels of this news, WaMu's stock price plummeted further, closing at
25
   $20.04 per share, its lowest closing price in seven years. Jessica Mintz, *Tough Looking 2008*
26
   *Sinks WaMu Shares*, Associated Press, Nov. 7, 2007.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 33

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE· (206) 623-1900
FACSIMILE· (206) 623-3384

6.  **Throughout the Class Period, WaMu Failed to Sufficiently Reserve for Various Liabilities and Obligations Related to Mortgages that it Securitized or Sold.**

115.   Even absent its participation in the manipulation of appraisals, WaMu's financial statements throughout the period failed to reflect the actual liabilities and losses to which the Company was exposed.

116.   As the credit squeeze tightened and mortgage woes escalated through late 2006 and into early 2007, WaMu failed to disclose and account for the increased risks it faced as a result. The Company allocates allowances for loan and lease losses, and, as a specialized subprime lender, WaMu expressly allocates allowances for losses from its subprime mortgage channel. But as the subprime crisis loomed over the mortgage market, WaMu allocated *less* for both general loan and lease losses and losses in its subprime mortgage channel in December 31, 2006 than it did in the prior year ending December 31, 2005 as demonstrated in the following chart prepared by WaMu:

| | December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | | 2004 | | |
| | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans [3] | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans [3] | Allowance for Loan and Lease Losses | Allocated Allowance as a % of Loan Category | Loan Category as a % of Total Loans [3] |
| | | | | | (dollars in millions) | | | | |
| Allocated allowance: | | | | | | | | | |
| Loans secured by real estate: | | | | | | | | | |
| Home loans [2] | $ 202 | 0.20% | 44.22% | $ 222 | 0.19% | 49.71% | $ 214 | 0.19% | 53.10% |
| Home equity loans and lines of credit [3] | 184 | 0.35 | 23.51 | 106 | 0.21 | 22.14 | 83 | 0.19 | 21.08 |
| Subprime mortgage channel [3] | 326 | 1.57 | 9.23 | 374 | 1.77 | 9.31 | 243 | 1.27 | 9.26 |
| Home construction [4] | 5 | 0.24 | 0.93 | 6 | 0.29 | 0.89 | 12 | 0.51 | 1.13 |
| Multi-family | 85 | 0.28 | 13.41 | 122 | 0.48 | 11.15 | 101 | 0.45 | 10.76 |
| Other real estate | 54 | 0.80 | 2.89 | 69 | 1.37 | 2.19 | 116 | 2.05 | 2.74 |
| Total allocated allowance secured by real estate | 856 | 0.40 | 94.29 | 899 | 0.41 | 95.29 | 769 | 0.38 | 98.07 |
| Consumer: | | | | | | | | | |
| Credit card | 308 | 4.68 | 4.83 | 328 | 4.08 | 3.50 | – | – | – |
| Other | – | 2.32 | 0.12 | 27 | 4.25 | 0.28 | 36 | 4.55 | 0.38 |
| Commercial | 45 | 2.64 | 0.76 | 44 | 2.03 | 0.93 | 51 | 1.59 | 1.55 |
| Total allocated allowance held in portfolio | 1,416 | 0.63 | 100.00 | 1,298 | 0.57 | 100.00 | 856 | 0.41 | 100.00 |
| Unallocated allowance | 214 | 0.09 | – | 397 | 0.17 | – | 445 | 0.22 | – |
| Total allowance for loan and lease losses | $ 1,630 | 0.72% | 100.00% | $ 1,695 | 0.74% | 100.00% | $ 1,301 | 0.63% | 100.00% |

2006 Form 10-K at 61.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 34

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

117.    WaMu retains subordinated interests in mortgages that it securitizes and makes representations to buyers about performance and other characteristics of mortgages that it sells. The Company's Quarterly Reports for 2007 reveal that WaMu under-reserved for credit risk arising from its retained subordinated interests and understated liabilities arising from representations it made regarding sold mortgages.

118.    For instance, between March 31, 2007 and September 30, 2007 the Company increased its recorded reserves and liabilities despite a substantial *decrease* of the related assets or revenue.   From March 31, 2007 to September 30, 2007 WaMu's subordinated interests decreased from $2.71 billion to $2.29 billion; during the same period, its allowance for loan and lease losses mushroomed from $1.54 billion to $1.89 billion, an increase of more than 20% despite the decrease in subordinated interests.   *See* Quarterly Report (Form 10-Q) (Mar. 31, 2007) and Quarterly Report (Form 10-Q) (Sept. 30, 2007).

119.    WaMu's need to increase its loan loss provisions demonstrates that its previously announced earnings and equity were inflated and did not properly account for the actual condition of the Company's loan holdings.

**7.    WaMu's Financial Problems Come to Light.**

120.    On October 17, 2007, WaMu officially reported its third-quarter results and dropped another bombshell regarding its losses on loans.

> If you think the worst is over for mortgage lenders, a close look at Washington Mutual's balance sheet should dispel that notion pretty quickly. The largest U.S. savings and loan stunned investors Oct. 17 when it said it would set aside as much as $1.3 billion this quarter to cover anticipated loan losses.   The news came the same day Seattle-based WaMu announced a 72 percent drop in third-quarter profit to $210.
>
> Since then, its stock has fallen 28 percent.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 35

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    But the real wonder it that WaMu's forecast for fourth-quarter loan-loss
2    provisions wasn't substantially higher.

3    Jonathan Weil, *Mortgage Mess Hitting WaMu Hard*, Bloomberg News, Nov. 4, 2007.

4    121.    According to *Bloomberg's* Weil and other finance commentators, WaMu still has
5    not come clean on its full exposure to risky subprime loans.  Weil noted that WaMu's third-
6    quarter "balance sheet maneuvers are a classic case of earnings management."  Jonathan Weil,
7    *Countrywide, WaMu Play Shell Games*, Bloomberg News, Nov. 4, 2007.  WaMu shifted $17
8    billion of loans to its investment portfolio, which permitted it to avoid accounting for them based
9    on their current market value.  According to Weil: "While the distinction may look arbitrary, the
10   effect on short-term earnings under the accounting rules can be huge when loan values are
11   
12   falling, as they are now."  *Id.*

13   122.    On the basis of the Company's third-quarter results, financial analysts have
14   panned WaMu.  Between October 18 and October 22, four analysts downgraded the stock.
15   Lehman Brothers analyst Bruce Harting estimated WaMu's loan losses for 2008 at $5 billion for,
16   topping his original estimate of $3.8 billion.  Jessica Mintz, *Tough Looking 2008 Sinks WaMu*
17   *Shares*, Associated Press, Nov. 7, 2007.
18

19   123.    The Company's earnings management and incremental disclosure of its loan loss
20   exposure has failed to satisfy investors. The stock, which traded above $40 a share as recently as
21   June, fell to $19.39 on November 8, 2007.  As a local Seattle columnist noted:

22        At the close of trading Wednesday, WaMu stock finished at $20.04 a
23        share.  That's grim enough when put in historical context.  That was the
          lowest price since June 2000.
24
          It's even worse with a considerably shorter horizon.  WaMu peaked at
25        $46.55 in November 2003.  As recently as June this year, you could have
          paid $44.41 a share.
26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 36

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE. (206) 623-1900
FACSIMILE: (206) 623-3384

1

2

3

> And it really gets ugly when looking back a few days. On Wednesday, WaMu's stock dropped 17 percent from its Tuesday close, down $4.19 a share; at one point during the trading day, it was actually below $20 a share.

4

> To sum up: In less than six months, WaMu has seen more than half of its stock price melt away.

5

6

Bill Virgin, *WaMu Executives Try to Rally Investors, Meet Skepticism*, Seattle Post-Intelligencer, Nov. 7, 2007.

7

8

9

  124. Over the course of the Class Period, WaMu shares tumbled from $46.42 to $18.30, a decline of 60 percent. As of November 19, 2007, WaMu shares were trading at their lowest prices in over seven years.

10

11

**B. Defendants Knew or Should Have Known That WaMu Stock Was an Imprudent Investment.**

12

13

14

15

16

17

18

19

20

  125. During the Class Period, as described herein, Defendants knew or, had they properly discharged their fiduciary obligations, would have known that WaMu stock was an imprudent investment for the Plan due to WaMu's serious mismanagement and improper business practices, including, among other practices, the Company's: (1) increasingly risk-fraught lending practices; (2) lack of adequate risk-management controls over its improper lending practices contributing to high delinquency and foreclosure rates among borrowers; (3) role in the systematic inflation of property appraisals during the loan origination process; and (4) misrepresentations regarding the Company's financial condition.

21

22

23

  126. As a result, WaMu's stock price and the price of the Fund were artificially inflated making them an imprudent investment for the Plan.

24

25

26

  127. As a result of Defendants' knowledge of the public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in WaMu stock did not

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - Page - 37

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    effectively inform the Plan's participants of the past, immediate, and future risks of investing in

2    Company stock.

3            128.    Defendants also failed to take into account the changing risk profile of the WaMu

4    stock investment as a result of the above circumstances and the Company's deteriorating

5    financial circumstances as demonstrated by objective indicators for evaluating a company's

6

7    ongoing viability.

8            129.    The Defendants failed to conduct an appropriate investigation into whether WaMu

9    stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's

10   participants with information regarding WaMu's tremendous problems so that participants could make

11   informed decisions regarding their investments in the Plan.

12

13           130.    An adequate or even cursory investigation by Defendants would have revealed to a

14   reasonable fiduciary that, under these circumstances, investment by the Plan in WaMu stock was

15   excessively and unduly risky, and, thus, imprudent.  A prudent fiduciary acting under similar

16   circumstances would have acted to protect participants against unnecessary losses and would have

17   made different investment decisions.  Such action was particularly appropriate here since the Plan did

18   not require the fiduciaries to offer WaMu stock as a Plan investment option, or maintain any investment

19   in the stock.

20

21           131.    Because Defendants knew or should have known that WaMu was not a prudent

22   investment option for the Plan, they had a fiduciary duty to protect the Plan and its participants from

23   unreasonable and entirely predictable losses incurred as a result of the Plan's investment in WaMu

24   stock.

25           132.    Defendants had available to them several different options for satisfying this duty,

26   including: making appropriate public disclosures, as necessary; divesting the Plan of WaMu stock;

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 38

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   discontinuing further contributions to and/or investment in WaMu stock under the Plan; consulting

2   independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve

3   the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of

4   their employment by WaMu they could not loyally serve the Plan and its participants in connection

5   with the Plan's acquisition and holding of WaMu stock.

6

7         133.    Despite the availability of these and other options, Defendants failed to take any action

8   to protect participants from losses resulting from the Plan's investment in WaMu stock.  In fact,

9   Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as

10  WaMu's problems came to light.

11        134.    In addition, the Defendants failed to adequately review the performance of the other

12  fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and

13

14  ERISA.

15        135.    When it came to their own personal holdings of WaMu stock, however, several

16  defendants, including Killinger, sold millions of dollars of the stock, effectively cashing in while

17  hanging Plan participants out to dry.  Such conduct violated the duties of prudence and loyalty under

18  ERISA.

19
    **C.    Defendants Failed to Provide Plan Participants with Complete and Accurate**
20  **       Information about the True Risks of Investment in WaMu Stock in the Plan.**

21        136.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its

22  participants which includes the duty to speak truthfully to the plan and its participants when

23  communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA

24  includes an obligation not to materially mislead, or knowingly allow others to materially

25  mislead, plan participants and beneficiaries.

26

    137.    During the Class Period, upon information and belief, Defendants made direct and

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 39

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   indirect communications with participants in the Plan which included statements regarding

2   investments in Company stock. These communications included, but were not limited to, SEC

3   filings, annual reports, press releases, and Plan documents, in which Defendants failed to

4   disclose that Company stock was not a prudent retirement investment, and which were

5   incorporated by reference in Plan documents. The Company regularly communicated with

6   employees, including participants in the Plan, about the performance, future financial and

7

8   business prospects of the Company's common stock, which was, far and away, the single largest

9   asset of the Plan. 2006 Form 11-K at 10.

10      138.    Defendants, as the Plan's fiduciaries, knew or should have known certain basic

11   facts about the characteristics and behavior of the Plan's participants, well-recognized in the

12   401(k) literature and the trade press, concerning investment in company stock, including that:

13

14          (a).    Employees tend to interpret a match in company stock as an endorsement

15          of the company and its stock;

16          (b).    Out of loyalty, employees tend to invest in company stock;

17          (c).    Employees tend to over-extrapolate from recent returns, expecting high

18          returns to continue or increase going forward;

19          (d).    Employees tend not to change their investment option allocations in the

20          plan once made;

21

22          (e).    No qualified retirement professional would advise rank and file employees

23          to invest more than a modest amount of retirement savings in company stock, and

24          many retirement professionals would advise employees to avoid investment in

25          company stock entirely;

26          (f).    Lower income employees tend to invest more heavily in company stock

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 40

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    than more affluent workers, though they are at greater risk; and

2    (g).    Even for risk-tolerant investors, the risks inherent to company stock are

3    not commensurate with it rewards.

4    139.    Even though Defendants knew or should have known these facts, and even though

5    Defendants knew of the concentration of the Plan's funds in Company stock during the Class

6    Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its

7    participants from their heavy investment in an imprudent retirement vehicle, WaMu stock.

8

9    140.    In addition, Defendants failed to provide participants, and the market as a whole,

10   with complete and accurate information regarding the true financial condition of the Company.

11   As such, participants in the Plan could not appreciate the true risks presented by investments in

12   Company stock and therefore could not make informed decisions regarding their investments in

13   Company stock in the Plan.

14

15   141.    Specifically, Defendants failed to provide the Plan's participants with complete

16   and accurate information regarding WaMu's serious mismanagement and improper business

17   practices, including, among other practices, the Company's: (1) increasingly risk-fraught lending

18   practices; (2) lack of adequate risk-management controls over its improper lending practices

19   contributing to high delinquency and foreclosure rates among borrowers; (3) role in the

20   systematic inflation of property appraisals during the loan origination process; and (4)

21   misrepresentations regarding the Company's financial condition.

22

23   142.    Even as late as September 2007, Defendant Killinger persisted in providing

24   inaccurate information that did not reflect the Company's exposure to subprime-related losses.

25   Speaking at the Lehman Brothers Financial Services conference, Killinger said:

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 41

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

As a policy, we don't provide interim updates to our earnings drivers between our quarterly earnings calls. However, the near-perfect storm in the housing and capital markets I spoke about will impact our second half performance and I want to give you my insights into what that may look like. Of course, we will be updating our earnings drivers during our third quarter earnings call next month. Given a weakening housing market, we do expect to see:

o    A continuation of the increase in nonperforming loans which could lead to a higher level of charge-offs in the coming quarters.

o    As a result of this, and in support of our loan portfolio growth, we expect that our loan loss provisioning for the year could be approximately $500 million greater than the full-year guidance we gave in July of $1.5 to $1.7 billion.

*See* Current Report (Form 8-K) (Sept. 10, 2007) at Ex. 99.1.

143.    Just as the July guidance was inaccurate, Defendant Killinger's estimate was off by nearly **30%**.  In just a month's time, the Company revised the loan loss provisioning up to between $2.7 and $2.9 billion.  *Washington Mutual, Inc. Prepared Remarks for Third Quarter 2007 Earnings Conference Call*, Oct. 17, 2007, *available at* http://investors.wamu.com/Cache/1001137714.PDF?o=3&O=PDF&iid=102028&fid=10011377 14&D=&T=&Y=.

144.    Throughout the Class Period, the participants were not informed of the true risks of investing their retirement assets in the Plan in WaMu stock.

**D.    Defendants Suffered From Conflicts of Interest.**

145.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including the investment in WaMu stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 42

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    146.    Conflicts of interest abound when a company that invests plan assets in company

2    stock founders.  This is because as the situation deteriorates, plan fiduciaries are torn between

3    their duties as officers and directors for the company on the one hand, and to the plan and plan

4    participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the

5    prudent person standard requires that he make a careful and impartial investigation of all

6

7    investment decisions.'"  *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992) (citation omitted).

8    Here, Defendants breached this fundamental fiduciary duty.

9    147.    Defendants failed to investigate whether to take appropriate and necessary action

10   to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing

11   to offer WaMu stock as a Plan investment option, and maintain investment in WaMu stock in the

12   Plan.  Moreover, while certain Defendants, such as Defendant Killinger, dumped shares they

13

14   personally held, they did nothing to protect the Plan from losses due to the Plan's imprudent

15   investment in WaMu stock.

16                              **VIII.  THE RELEVANT LAW**

17   148.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

18   action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

19   149.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

20   provides, in pertinent part,

21

22               any person who is a fiduciary with respect to a plan who breaches any of
                 the responsibilities, obligations, or duties imposed upon fiduciaries by this
23               subchapter shall be personally liable to make good to such plan any losses
                 to the plan resulting from each such breach, and to restore to such plan any
24               profits of such fiduciary which have been made through use of assets of
                 the plan by the fiduciary, and shall be subject to such other equitable or
25               remedial relief as the court may deem appropriate, including removal of
                 such fiduciary.
26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 43

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

150.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

151.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

152.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002).  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Company Stock Fund, which invested in WaMu stock, to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 44

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    silence might be harmful; and (3) a duty to convey complete and accurate information material to

2    the circumstances of participants and beneficiaries.

3        153.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary,"

4    provides, in pertinent part,

5

6            In addition to any liability which he may have under any other provision
             of this part, a fiduciary with respect to a plan shall be liable for a breach of
7            fiduciary responsibility of another fiduciary with respect to the same plan
             in the following circumstances:

8
             (1) if he participates knowingly in, or knowingly undertakes to conceal, an
9            act or omission of such other fiduciary, knowing such act or omission is a
             breach;
10
             (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C.
11           § 1104(a)(1), in the administration of his specific responsibilities which
             give rise to his status as a fiduciary, he has enabled such other fiduciary to
12           commit a breach; or

13
             (3) if he has knowledge of a breach by such other fiduciary, unless he
14           makes reasonable efforts under the circumstances to remedy the breach.

15       154.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

16   responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be,

17   as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company

18
     stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit
19
     their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The
20
21   result would be a setting in which a major fiduciary breach could occur, but the responsible party

22   could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely

23   knows of a breach, a breach he had no connection with, he must take steps to remedy it:

24
             [I]f a fiduciary knows that another fiduciary of the plan has committed a
25           breach, and the first fiduciary knows that this is a breach, the first
             fiduciary must take reasonable steps under the circumstances to remedy
26           the breach. . . .  [T]he most appropriate steps in the circumstances may be
             to notify the plan sponsor of the breach, or to proceed to an appropriate

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 45

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1
2
3
4

Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

5      1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

6      155.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for

7      relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of

8      fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

9

10                         **IX. ERISA § 404(c) DEFENSE INAPPLICABLE**

11      156.    ERISA § 404(c) is an affirmative defense that provides a limited exception to

12      fiduciary liability for losses that result from participants' exercise of control over investment

13      decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control"

14      over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural

15      and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations

16      promulgated under it.

17
18      157.    ERISA § 404(c) does not apply here for several reasons.

19      158.    First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries'

20      imprudent decision to select and continue offering WaMu stock as an investment option in the

21      Plan as this is not a decision that was made or controlled by the participants. *See Final Reg.*

22      Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final

23      404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992)

24      (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment

25      options which are intended to constitute all or part of the investment universe of an ERISA §

26      404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 46

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    express plan language, is not a direct or necessary result of any participant direction of such

2    plan").

3         159.    Secondly, even as to participant-directed investment in WaMu stock, ERISA §

4    404(c) does not apply because Defendants failed to ensure effective participant control by

5
     providing complete and accurate material information to participants regarding WaMu stock.
6
7    See 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient

8    information to make informed decisions"). As a consequence, participants in the Plan did not

9    have informed control over the portion of the Plan's assets that were invested in WaMu stock as

10   a result of their investment directions, and the Defendants remain entirely responsible for losses

11   that result from such investment.
12
          160.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the
13
14   Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's investment in

15   WaMu stock is established upon proof that such investments were or became imprudent and

16   resulted in losses in the value of the assets in the Plan during the Class Period.

17        **X. DEFENDANTS' INVESTMENT IN WAMU STOCK IS NOT ENTITLED TO A**
                          **PRESUMPTION OF PRUDENCE**
18
19        161.    Some courts have applied a presumption of prudence to decisions by plan

20   fiduciaries to invest plan assets in company stock in plans that qualify as "ESOPs" under the

21   Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder.

22   The presumption is based on the dual purpose of an ESOP to allow employee ownership on the
23
     one hand, and save for retirement on the other. *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d
24
25   Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to

26   balance these concerns). "A plaintiff may then rebut this presumption of reasonableness by

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 47

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE (206) 623-1900
FACSIMILE: (206) 623-3384

1    showing that a prudent fiduciary acting under similar circumstances would have made a different

2    investment decision." *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)

3        162.    Here, even if a portion of the Plan is considered an ESOP, and a presumption of

4    prudence is applied to the Defendants' decision to offer WaMu stock as a Plan investment

5    option, the presumption is overcome by the facts alleged here, including, among other

6    averments:

7

8    • A precipitous stock price decline from over $46.42 to $18.30 during the Class Period;

9    • Risk of imminent further collapse of the price of WaMu stock based on WaMu's

10       practices as discussed in detail herein;

11   • The Company's seriously deteriorating financial condition as well as Defendants'

12      conflicted status as discussed in detail herein;

13

14   • Serious, if not gross, mismanagement evidenced by, among other things;

15       ▪    Expanding subprime mortgage origination even after widely-recognized

16          market conditions had already slowed revenue growth and exponentially

17          increased the risk of defaults and loan losses;

18       ▪    Participating in the systematic manipulation of loan origination practices;

19       ▪    Persistently failing to recognize, mitigate, and accurately disclose, the

20          Company's enormous exposure to loan losses;

21       ▪    Dishonest, misleading, and illegal actions as set forth above that caused

22          the price of WaMu stock to be artificially inflated; and

23       ▪    Defendants' conflicts of interest by which they held the Company's

24          interests above those of Plan participants through their failure to take prompt and

25          effective action to prevent further loss of participants' retirement savings.

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 48

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    163.    The imprudence of continued investment by Defendants in WaMu stock during

2    the Class Period under the circumstances present here is recognized in Department of Labor

3    regulations:

4

5    [B]ecause every investment necessarily causes a plan to forgo other
     investment opportunities, an investment will not be prudent if it would be
6    expected to provide a plan with a lower rate of return than available
     alternative investments with commensurate degrees of risk or is riskier
7    than alternative available investments with commensurate rates of return.

8    29 C.F.R. 2509.94-1.  Defendants had available to them investment alternatives to WaMu stock

9    that had either a higher rate of return with risk commensurate to WaMu stock or an expected rate

10   of return commensurate to WaMu stock but with less risk.

11   164.    Based on these circumstances, and the others alleged herein, it was imprudent and

12   an abuse of discretion for Defendants to continue to make and maintain investment in WaMu

13

14   stock, and, effectively, to do nothing at all to protect the Plan from significant losses as a result

15   of such investment during the Class Period.

16                                **XI.  CAUSES OF ACTION**

17   **A.      Count I: Failure to Prudently and Loyally Manage the Plan and Assets of the Plan**

18   165.    Plaintiff incorporates by this reference the paragraphs above.

19   166.    This Count alleges fiduciary breach against the following Defendants:   WaMu

20   and the Investment Committee Defendants (the "Prudence Defendants").

21   167.    As alleged above, during the Class Period the Prudence Defendants were named

22   fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within

23

24   the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by

25   the duties of loyalty, exclusive purpose, and prudence.

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 49

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

168.   As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included, on information and belief, managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

169.   Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan.  Specifically, during the Class Period, these Defendants knew or should have known that WaMu common stock no longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's serious mismanagement, dire financial circumstances, and the imminent risk of collapse of WaMu stock as a result thereof. Nonetheless, during the Class Period, these Defendants continued to offer WaMu stock as an investment option for participant contributions.  They did so despite evidence that the Company was overexposed to the risks of subprime lending, including rapidly increasing defaults and corresponding loan losses, and that the price of WaMu stock was artificially inflated as a result of the failure of the Defendants to provide complete and accurate information to Plan participants and the market generally.

170.   The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because:  (a) company stock is a particularly risky and volatile

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - Page - 50

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   investment, even in the absence of company misconduct; and (b) participants tend to

2   underestimate the likely risk and overestimate the likely return of investment in company stock.

3   In view of this, the Prudence Defendants were obliged to have in place a regular, systematic

4   procedure for evaluating the prudence of investment in Company stock.

5

6   171.    Moreover, the Prudence Defendants failed to conduct an appropriate investigation

7   of the merits of continued investment in WaMu stock even in light of the losses, the Company's

8   highly risky and inappropriate practices, and the particular dangers that these practices posed to

9   the Plan.   Such an investigation would have revealed to a reasonably prudent fiduciary the

10  imprudence of continuing to make and maintain investment in WaMu stock under these

11  circumstances.

12

13  172.    The Prudence Defendants' decisions respecting the Plan's investment in WaMu

14  stock described above, under the circumstances alleged herein, abused their discretion as ERISA

15  fiduciaries in that a prudent fiduciary acting under similar circumstances would have made

16  different investment decisions.   Specifically, based on the above, a prudent fiduciary could not

17  have reasonably believed that further and continued investment of the Plan's contributions and

18  assets in WaMu stock was in keeping with the Plan settlor's expectations of how a prudent

19  fiduciary would operate.

20

21  173.    The Prudence Defendants were obligated to discharge their duties with respect to

22  the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that

23  a prudent man acting in a like capacity and familiar with such matters would use in the conduct

24  of an enterprise of a like character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C.

25  § 1104(a)(1)(B).

26

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

174.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

175.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  o   The composition of the portfolio with regard to diversification;

  o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  o   The projected return of the portfolio relative to the funding objectives of the plan.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 52

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

176.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in WaMu stock because, among other reasons:

- The Prudence Defendants knew of and/or failed to investigate the failures of the Company, including, but not limited to the following, which made the Company an extremely risky and imprudent investment for the Plan: (a) the Company's over reliance on subprime lending; (b) the Company's participation in the systematic manipulation of the loan origination process; (c) the Company's failure to implement and maintain risk management control processes; and (d) the Company's failure properly to account for its subprime lending business operations

- The risk associated with the investment in WaMu stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in WaMu stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was significantly invested in Company stock, the Prudence Defendants had a

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 53

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    heightened responsibility to divest the Plan of Company stock if it became or

2    remained imprudent.

3    177.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts

4    of interest and to resolve them promptly when they occur. A fiduciary must always administer a

5    plan with single-minded devotion to the interests of the participants and beneficiaries, regardless

6    of the interests of the fiduciaries themselves or the plan sponsor. Upon information and belief,

7    the compensation and tenure of the Prudence Defendants was tied to the performance of WaMu

8    stock and/or the publicly reported financial performance of WaMu. Fiduciaries laboring under

9    such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure

10   that their decision making process is untainted by the conflict and made in a disinterested

11   fashion, typically by seeking independent financial and legal advice obtained only on behalf of

12   the plan.

13   178.    The Prudence Defendants breached their duty to avoid conflicts of interest and to

14   promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could

15   make independent judgments concerning the Plan's investment in WaMu; failing to notify

16   appropriate federal agencies, including the DOL, of the facts and circumstances that made

17   WaMu stock an unsuitable investment for the Plan; failing to take such other steps as were

18   necessary to ensure that participants' interests were loyally and prudently served; with respect to

19   each of these above failures, doing so in order to avoid adversely impacting their own

20   compensation or drawing attention to WaMu's inappropriate practices; and by otherwise placing

21   their own and WaMu's improper interests above the interests of the participants with respect to

22   the Plan's investment in WaMu stock.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 54

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

179.    Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

180.    Thus, even to the extent that the Plan required the fiduciaries to offer WaMu stock as an investment option, which Plaintiffs dispute, the Prudence Defendants breached their duty of prudence by continuing to offer WaMu stock as an investment option for participant contributions in the Plan, when the Prudence Defendants knew or should have known that WaMu stock no longer was a prudent investment for participants' retirement savings.

181.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered significant losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost well over $175 million dollars of retirement savings.

182.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II: Failure to Monitor Fiduciaries**

183.    Plaintiff incorporates by this reference the allegations above.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 55

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1      184.    This Count alleges fiduciary breach against the following Defendants: WaMu; the

2    Director Defendants; and the HR Committee (the "Monitoring Defendants").

3      185.    As alleged above, during the Class Period the Monitoring Defendants were named

4    fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within

5    the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by

6    the duties of loyalty, exclusive purpose, and prudence.

7

8      186.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring

9    Defendants included the responsibility to appoint, and remove, and thus, monitor the

10   performance of other fiduciaries, as follows:

11

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| WaMu | Investment Committee Defendants. | ¶¶ 43-47 |
| Director Defendants | Investment Committee Defendants. | ¶¶ 48-50 |
| HR Committee | Investment Committee and Administration Committee | ¶¶ 51-53 |

16      187.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

17   are performing their fiduciary obligations, including those with respect to the investment and

18   holding of plan assets, and must take prompt and effective action to protect the plan and

19   participants when they are not.

20      188.    The monitoring duty further requires that appointing fiduciaries have procedures

21   in place so that on an ongoing basis they may review and evaluate whether the "hands-on"

22   fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work

23

24   and the plan's performance, and by ensuring that they have a prudent process for obtaining the

25   information and resources they need).  In the absence of a sensible process for monitoring their

26   appointees, the appointing fiduciaries would have no basis for prudently concluding that their

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 56

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   appointees were faithfully and effectively performing their obligations to plan participants or for

2   deciding whether to retain or remove them.

3       189.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with

4   complete and accurate information in their possession that they know or reasonably should know

5   that the monitored fiduciaries must have in order to prudently manage the plan and the plan

6   assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions

7

8   regarding the plan.

9       190.   The Monitoring Defendants breached their fiduciary monitoring duties by, among

10  other things: (a) failing, at least with respect to the Plan's investment in Company stock, to

11  monitor their appointees, to evaluate their performance, or to have any system in place for doing

12
    so, and standing idly by as the Plan suffered enormous losses as a result of their appointees'
13
14  imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the

15  monitored fiduciaries appreciated the true extent of WaMu's highly risky and inappropriate

16  business practices, and the likely impact of such practices on the value of the Plan's investment

17  in WaMu stock; (c) to the extent any appointee lacked such information, failing to provide

18  complete and accurate information to all of their appointees such that they could make

19
    sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to
20
21  remove appointees whose performance was inadequate in that they continued to make and

22  maintain investments in WaMu stock despite their knowledge of practices that rendered WaMu

23  stock an imprudent investment during the Class Period for participants' retirement savings in the

24  Plan, and who breached their fiduciary duties under ERISA.

25      191.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the

26  Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 57

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    monitoring duties as described above, the losses suffered by the Plan would have been

2    minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

3    duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost well

4    over $175 million dollars of retirement savings.

5

6        192.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

7    and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

8    breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

9    appropriate.

10   **C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate**
11   **Information to the Plan's Participants and Beneficiaries.**

12       193.    Plaintiff incorporates by this reference the allegations above.

13       194.    This Count alleges fiduciary breach against the Administration Committee

14   Defendants (the "Communications Defendants").

15       195.    At all relevant times, as alleged above, Defendants listed in this Count were

16   fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were

17
     bound by the duties of loyalty, exclusive purpose, and prudence.
18

19       196.    At all relevant times, the scope of the fiduciary responsibility of the Defendants

20   included the communications and material disclosures to the Plan's participants and

21   beneficiaries.

22       197.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to

23   participants, not to mislead them regarding the plan or plan assets, and to disclose information

24   that participants need in order to exercise their rights and interests under the plan.  This duty to

25   inform participants includes an obligation to provide participants and beneficiaries of the plan

26   with complete and accurate information, and to refrain from providing false information or

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 58

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   concealing material information, regarding plan investment options so that participants can make

2   informed decisions with regard to the prudence of investing in such options made available under

3   the plan. This duty applies to all of the Plan's investment options, including investment in

4   WaMu stock.

5

6        198.    Because investments in the Plan were not diversified (*i.e.* the Defendants chose to

7   allow the Plan's assets to be invested heavily in WaMu stock), such investment carried with it an

8   inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete

9   and accurate information particularly important with respect to WaMu stock.

10       199.    The Defendants breached their duty to inform participants by failing to provide

11  complete and accurate information regarding WaMu's serious mismanagement and improper

12  business practices and public misrepresentations, and the consequential artificial inflation of the

13

14  value of WaMu stock, and, generally, by conveying incomplete information regarding the

15  soundness of WaMu stock and the prudence of investing and holding retirement contributions in

16  WaMu equity. These failures were particularly devastating to the Plan and its participants; a

17  large percentage of the Plan's assets were invested in WaMu stock during the Class Period and,

18  thus, losses in this investment had a significant impact on the value of participants' retirement

19  assets.

20

21       200.    Defendants' omissions clearly were material to participants' ability to exercise

22  informed control over their Plan accounts, as in the absence of the information, participants did

23  not know the true risks presented by the Plan's investment in WaMu stock.

24       201.    Defendants' omissions and incomplete statements alleged herein were Plan-wide

25  and uniform in that Defendants failed to provide complete and accurate information to any of the

26  Plan's participants.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 59

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    202.    Defendants in this Count were unjustly enriched by the fiduciary breaches

2   described in this Count.

3    203.    As a direct and proximate result of the breaches of fiduciary duties alleged herein,

4   the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a

5   significant portion of their retirement investment.

6

7    204.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29

8   U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by

9   their breaches of fiduciary duties alleged in this Count.

10   **D.    Count IV: Co-Fiduciary Liability**

11    205.    Plaintiff incorporates by this reference the allegations above.

12    206.    This Count alleges co-fiduciary liability against the following Defendants: all

13   Defendants (the "Co-Fiduciary Defendants").

14

15    207.    As alleged above, during the Class Period the Co-Fiduciary Defendants were

16   named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries

17   within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were

18   bound by the duties of loyalty, exclusive purpose, and prudence.

19    208.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a

20   fiduciary, in addition to any liability which he may have under any other provision, for a breach

21

22   of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach

23   and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary

24   Defendants breached all three provisions.

25    209.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C.

26   § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 60

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

210. WaMu, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices, and, thus, knowledge of such practices is imputed to WaMu as a matter of law.

211. Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of WaMu's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

212. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. WaMu knowingly participated in the fiduciary breaches of the Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for Plan participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - Page - 61

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   rendered WaMu stock an imprudent retirement investment and yet, ignoring their oversight

2   responsibilities, permitted the Prudence Defendants to breach their duties.

3       213.   **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability

4   on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the

5   administration of his specific responsibilities which give rise to his status as a fiduciary, he has

6
7   enabled another fiduciary to commit a breach.

8       214.   The Monitoring Defendants' failure to monitor the HR and Investment

9   Committees enabled those committees to breach their duties.

10      215.   As a direct and proximate result of the breaches of fiduciary duties alleged herein,

11  the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost well

12
    over $175 million dollars of retirement savings.
13

14      216.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)

15  and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their

16  breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

17  appropriate.

18  **E.    Count V: Knowing Participation in a Breach of Fiduciary Duty.**

19      217.   Plaintiff incorporates the allegations contained in the previous paragraphs of this

20  Complaint as if fully set forth herein.
21

22      218.   To the extent that WaMu is found not to have been fiduciary or to have acted in a

23  fiduciary capacity with respect to the conduct alleged to have violated ERISA, WaMu knowingly

24  participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary

25  capacity and as such is liable for equitable relief as a result of participating in such breaches.

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 62

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

219. WaMu benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing WaMu stock to the Plan while the value of the stock was inflated as the result of WaMu's highly risky and improper business practices, and providing the market with materially misleading statements and omissions. Accordingly, WaMu may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of WaMu stock which would have been contributed to the Plan, but for WaMu's participation in the foregoing breaches of fiduciary duty.

## XII. CAUSATION

220. The Plan suffered well over $175 million dollars in losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in WaMu stock during the Class Period, in breach of Defendants' fiduciary duties.

221. The Prudence Defendants are liable for losses to the portion of Plan's assets invested in WaMu stock as a result of participant contributions because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

222. The Prudence Defendants also are liable for losses that resulted from their decision to invest nearly all of the assets of the Company Stock Fund in WaMu stock rather than cash or other short-term investment options, as authorized by the Plan, and clearly prudent under the circumstances presented here.

223. Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating WaMu stock as an investment alternative when it

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 63

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  became imprudent, and divesting the Plan of WaMu stock when maintaining such an investment

2  became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly,

3  the participants suffered.

4  
5  ### XIII. REMEDY FOR BREACHES OF FIDUCIARY DUTY

6  224.    The Defendants breached their fiduciary duties in that they knew or should have

7  known the facts as alleged above, and therefore knew or should have known that the Plan's

8  assets should not have been invested in WaMu stock during the Class Period.

9  225.    As a consequence of the Defendants' breaches, the Plan suffered significant

10  losses.

11  226.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring

12  a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires

13  
14  "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to

15  make good to such plan any losses to the plan...."  Section 409 also authorizes "such other

16  equitable or remedial relief as the court may deem appropriate...."

17  227.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty

18  result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made

19  or maintained its investments in the challenged investment and, instead, prudent fiduciaries

20  would have invested the Plan's assets in the most profitable alternative investment available to

21  them.  Alternatively, losses may be measured not only with reference to the decline in stock price

22  relative to alternative investments, but also by calculating the additional shares of WaMu stock

23  that the Plan would have acquired had the Plan fiduciaries taken appropriate steps to protect the

24  Plan.  The Court should adopt the measure of loss most advantageous to the Plan.  In this way,

25  
26  

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 64

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    the remedy restores the Plan's lost value and puts the participants in the position they would have

2    been in if the Plan had been properly administered.

3    228.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the

4    form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan

5

6    resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

7    based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

8    (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

9    provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c)

10   injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C.

11   1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable

12
     attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common
13

14   fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as

15   provided by law; and (6) such other legal or equitable relief as may be just and proper.

16   229.    Under ERISA, each Defendant is jointly and severally liable for the losses

17   suffered by the Plan in this case.

18                          **XIV. CLASS ACTION ALLEGATIONS**

19   230.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Rules

20   23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiff and
21
     the following class of persons similarly situated (the "Class"):
22

23   231.    All persons, other than Defendants, who were participants in or beneficiaries of

24   the Plan at any time between July 19, 2006 and the present and whose accounts included

25   investments in WaMu stock.

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 65

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    232.    **Class Period.** The fiduciaries of the Plan knew or should have known at least by

2    July 19, 2006 that the Company's material weaknesses were so pervasive that WaMu stock could

3    no longer be offered as a prudent investment for a retirement plan.

4    233.    **Numerosity.** The members of the Class are so numerous that joinder of all

5    members is impracticable. While the exact number of Class members is unknown to Plaintiff at

6
     this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are,
7

8    based on the Plan's Form 5500 for Plan year 2005, more than 70,000 members of the Class who

9    participated in, or were beneficiaries of, the Plan during the Class Period.

10   234.    **Commonality.** Common questions of law and fact exist as to all members of the

11   Class and predominate over any questions affecting solely individual members of the Class.

12
     Among the questions of law and fact common to the Class are:
13

14          (a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the

15   Class;

16          (b)    whether Defendants breached their fiduciary duties to Plaintiff and members of

17   the Class by failing to act prudently and solely in the interests of the Plan's participants and

18   beneficiaries;

19
            (c)    whether Defendants violated ERISA; and
20

21          (d)    whether the Plan has suffered losses and, if so, what is the proper measure of

22   damages.

23   235.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the

24   Class because:  (a) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA

25   § 502(a)(2), his claim on behalf of the Plan is not only typical to, but identical to a claim under

26   this section brought by any Class member; and (2) to the extent Plaintiff seeks relief under

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 66

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class

2   members equally.

3       236.   **Adequacy.**   Plaintiff will fairly and adequately protect the interests of the

4   members of the Class and has retained counsel competent and experienced in class action,

5
    complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those

6
7   of the Class.

8       237.   **Rule 23(b)(1)(B) Requirements.**   Class action status in this ERISA action is

9   warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the

10  Class would create a risk of adjudications with respect to individual members of the Class which

11  would, as a practical matter, be dispositive of the interests of the other members not parties to the

12  actions, or substantially impair or impede their ability to protect their interests.

13

14      238.   **Other Rule 23(b) Requirements.**   Class action status is also warranted under the

15  other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of

16  the Class would create a risk of establishing incompatible standards of conduct for Defendants;

17  (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

18  making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

19
    to the Class as a whole; and (3) questions of law or fact common to members of the Class

20
21  predominate over any questions affecting only individual members and a class action is superior

22  to the other available methods for the fair and efficient adjudication of this controversy.

23                          **XV. PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiff prays for:

25      A.     A Declaration that the Defendants, and each of them, have breached their ERISA

26  fiduciary duties to the participants;

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 67

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    B.    A Declaration that the Defendants, and each of them, are not entitled to the

2    protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

3    C.    An Order compelling the Defendants to make good to the Plan all losses to the

4    Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan

5

6    resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the

7    Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the

8    participants would have made if the Defendants had fulfilled their fiduciary obligations;

9    D.    Imposition of a Constructive Trust on any amounts by which any Defendant was

10   unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

11   E.    An Order requiring Defendants to appoint one or more independent fiduciaries to

12   participate in the management of the Plan's investment in WaMu stock;

13

14   F.    Actual damages in the amount of any losses the Plan suffered, to be allocated

15   among the participants' individual accounts in proportion to the accounts' losses;

16   G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

17   H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29

18   U.S.C. § 1132(g), and other applicable law; and

19   I.    An Order for equitable restitution and other appropriate equitable and injunctive

20   relief against the Defendants.

21

22

23

24

25

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 68

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1     Dated: November 20, 2007.

2                                              KELLER ROHRBACK L.L.P.

3

4                                              By:

                                               Lynn L. Sarko, WSBA #16569
5                                              Derek W. Loeser, WSBA # 24274
                                               Erin M. Riley, WSBA # 30401
6                                              Tyler L. Farmer
                                               1201 Third Avenue, Suite 3200
7                                              Seattle, WA 98101-3052
                                               Telephone: (206) 623-1900
8                                              Facsimile: (206) 623-3384
9                                              lsarko@kellerrohrback.com
                                               dloeser@kellerrohrback.com
10                                             eriley@kellerrohrback.com
                                               tfarmer@kellerrohrback.com
11

12                                             *Counsel for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER
THE EMPLOYEE RETIREMENT INCOME SECURITY ACT -
Page - 69

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384